BRADSHAW v. BROWN. (No. 8219.)

(Court of Civil Appeals of Texas. Dallas.
Jan. 17, 1920. Rehearing Denied
Feb. 28, 1920.)

1. TRIAL ⟨⟩139(1)—QUESTION FOR JURY
WHERE REASONABLE MINDS MIGHT DIFFER AS
TO CONCLUSION TO BE DRAWN FROM EVI-
DENCE.

When a state of facts is presented from
which an ultimate question must be drawn and
reasonable minds might differ as to what con-
clusion should be drawn from the ultimate facts
proven, the question is for the jury.

2. WILLS ⟨⟩47, 50 — AGE, FEEBLENESS, OR
LOSS OF VIGOR OR MEMORY DOES NOT INCA-
PACITATE TESTATRIX, CAPABLE OF UNDER-
STANDING HER OWN AFFAIRS.

The facts that testatrix is old, in feeble
health, or that her memory does not possess the
vigor of earlier years, or that she has excluded
from her bounty some or all of her legal heirs,
will not, in and of themselves, defeat will if
she retains sufficient mind or understood what
she was doing in making the will, the nature
and extent of her property, the disposition she
desires to make thereof, the persons she desires

to be recipients of her bounty, the mode of
distribution, and a mind capable of exercising
judgment, reason, and deliberation and capable
of seeing the consequences of will to a reason-
able degree, and the effect of it upon her estate
and family.

3. APPEAL AND ERROR ⟨⟩1001(1)—JURY FIND-
ING SUPPORTED BY EVIDENCE CONCLUSIVE.

Jury finding which is sustained by evidence
is conclusive on appellate court.

4. APPEAL AND ERROR ⟨⟩1001(1)—FINDING
BY JURY WILL BE SUSTAINED WHERE DIFFER-
ENT MINDS MIGHT REACH DIFFERENT CONCLU-
SIONS FROM THE EVIDENCE.

Evidence will be held sufficient to justify ju-
ry finding if the record presents a state of facts
from which reasonable minds might reach differ-
ent conclusions.

5. WILLS ⟨⟩324(2)—MENTAL CAPACITY HELD
FOR JURY.

In contest of a will of 79 year old, enfeebled
testatrix on ground of mental incapacity, ques-
tion of incapacity held for jury.

6. WILLS ⟨⟩55(7)—EVIDENCE SUFFICIENT TO
SHOW MENTAL INCOMPETENCY.

Evidence held to justify finding that 79 year
old testatrix did not have sufficient testamentary
capacity to make a valid and binding will.

7. TRIAL ⟨⟩194(9)—REQUESTED INSTRUCTION
ON MENTAL COMPETENCY OF TESTATOR HELD
ON WEIGHT OF EVIDENCE.

In contest of 79 year old testatrix's will on
ground of mental incompetence, requested charge
on testamentary capacity as affected by old
age and sickness held properly refused as on the
weight of the evidence.

8. WILLS ⟨⟩52(6)—MENTAL INCAPACITY MAY
BE INFERRED FROM ENFEEBLED CONDITION OF
MIND AND BODY.

Mental incapacity may be inferred from an
enfeebled condition of the mind and body.

9. TRIAL ⟨⟩244(2)—INSTRUCTION ON PROBA-
TIVE FORCE OF TESTIMONY NEED NOT CON-
TAIN EVERY STATEMENT MADE BY COURT IN
PASSING ON SUFFICIENCY OF EVIDENCE TO
JUSTIFY PARTICULAR FINDING.

Every statement made by the court in dis-
cussing and passing on the sufficiency or in-
sufficiency of certain evidence to justify a par-
ticular finding in a given case need not be in-
corporated in the instructions given as a guide
to the jury in determining the probative force
of the testimony submitted for its consideration,
as result would be to give undue prominence to
such matters.

10. APPEAL AND ERROR ⟨⟩1078(4)—OBJECTION
TO INSTRUCTION WAIVED BY FAILURE TO
BRIEF.

Instruction, the giving of which is not as-
signed as error in appellant's brief, will not be
considered; objection thereto having been
waived.

Appeal from District Court, Dallas Coun-
ty; Kenneth Foree, Judge.

Proceedings by W. A. Bradshaw to pro-
bate instrument purporting to be last will

and testament of Mrs. S. A. Brown, contested by F. A. Brown. Judgment denying probate of will, and proponent appeals. Affirmed.

Clirit, Chilton & Eades, of Dallas, for appellant.

Thompson, Knight, Baker & Harris, of Dallas, for appellee.

TALBOT, J. The appellant, W. A. Bradshaw, offered for probate in the county court of Dallas county, Tex., an instrument purporting to be the last will and testament of Mrs. S. A. Brown. This instrument was dated October 7, 1916. Mrs. Brown died November 6, 1916. She was about 79 years old at the date of her death, and had been sick and confined to her bed and room for about two months prior thereto. She left surviving her husband, F. A. Brown, who was about 82 years of age. The couple had been married since about 1884, but had no children, though the husband, F. A. Brown, had a son by a former marriage, named Ernest Brown. The property they owned was a tract of 150 acres of land situated in 'Dallas county, upon which they resided as their homestead, and comparatively a small amount of personal property. In the instrument offered for probate, several small devises were made to Mrs. Brown's relatives, but the greater part of her property was given to her nephews, W. A. Bradshaw, the proponent, and Robert Bradshaw. None of it was bequeathed to her husband, but all devised subject to his homestead rights. The proponent, W. A. Bradshaw, was named as independent executor. F. A. Brown, the husband, contested the application of W. A. Bradshaw to probate the instrument as the will of Mrs. Brown on the grounds that Mrs. Brown, at the time of its execution, did not possess testamentary capacity, and was unduly influenced by the said W. A. Bradshaw to execute the same. Judgment was rendered in the county court admitting the alleged will to probate, and the contestant appealed to the district court, where trial was had before a jury. After defining testamentary capacity and undue influence, the district judge submitted to the jury for their determination the following issues:

First. "Did the deceased, Mrs. S. A. Brown, at the time of making the will in question, have testamentary capacity as that term has been defined?" Second. "Was the deceased, Mrs. S. A. Brown, at the time of making the will in question, unduly influenced by W. A. Bradshaw as undue influence has been defined?"

The jury answered both of these questions in the affirmative, and judgment was rendered, denying probate of the will. From this judgment the proponent appealed.

The first contention of the appellant is that—

"There was no substantial evidence to sustain the verdict of the jury, finding against the validity of the will on the issue of testamentary capacity."

[1] To ascertain whether or not this view of the evidence is correct, we have carefully read and re-read the statement of facts. The rule is that—

"When the record presents a state of facts from which an ultimate conclusion must be drawn, and reasonable minds might differ as to what conclusion should be drawn from the ultimate facts proven, it then becomes a jury question."

[2] The ultimate fact here to be determined is: Did the testator, Mrs. Brown, possess a mind capable of understanding what she was doing in making the will; an intelligent perception and understanding of the nature and extent of her property; the disposition she desired to make of it; the persons she desired to be the recipients of her bounty; the mode of distribution among them; and a mind capable of exercising judgment, reason, and deliberation, and capable of weighing the consequences of her will to a reasonable degree, and the effect of it upon her estate and family at the time of the execution of the will? It is not necessary that the mind of the testator retain all the vigor and force incident to youth, or that which attends upon robust physical health, in order that he have the capacity to which we have referred. So that the mere fact, standing alone, that he is' old, in feeble health, or that his memory does not possess the vigor of earlier years, or the fact that he has excluded from his bounty some or all of his legal heirs, etc., will not, in and of themselves, defeat a will executed by him, if, notwithstanding this, he retains sufficient mind to understand and appreciate the things above mentioned.

[3, 4] As shown in our statement of the case, the issue of whether or not Mrs. Brown possessed "testamentary capacity" at the time she executed the will in question was submitted by the court to the jury, and their verdict is that she did not. If, therefore, the record discloses evidence supporting and sustaining this finding, we are bound by it. So, with the view of ascertaining whether or not there is, in the record, sufficient evidence upon which a jury might reasonably base a conclusion that the testator in this instance, at the time of the execution of the instrument purporting to be her will, did not have that testamentary capacity required in order to enable her to make a binding will, we have carefully examined the record, and, bearing in mind the rules laid down for guidance in such matters, see no clear or proper way to escape the conclusion that the record presents a state of facts from which reasonable minds, at least, might reach different conclusions in regard to the question,

and that, this being true, it must be held that the evidence was sufficient to justify the jury's finding.

[5] It would be impracticable to quote or state all the testimony adduced on the issue. Enough to show that the issue was raised, and hence proper for the determination of the jury, must suffice.

Mrs. May King, a neighbor and intimate friend of the testatrix, and who visited her every few days, testified, in effect, that Mrs. Brown acted different from the way a normal person would act; that she was very childish, and that while engaged in a very entertaining conversation, she would suddenly sit down on the floor and take off her shoes and stockings and ask the witness to look at her feet; that at other times she would, all through the conversation, get up and run out in the kitchen without making any explanation of why she did it; that she was very thin and emaciated, and her mind was "kinder flighty." That in her conversations she would say things that indicated that she did not know what she possessed; that she never did know some of her clothing; that she was very feeble-minded and like a child; that in her judgment Mrs. Brown was not capable of transacting any business or making a will; that Mrs. Brown apparently suffered very much during her last illness, which continued from some time in September, 1916, until her death on the 6th day of November, 1916; that she was so restless she was constantly "grabbing the clothes and pulling them up, and would see boogies and things"; that she was confined to her room from about the 1st of September, 1916, until her death in November; that there were a great many things Mrs. Brown did that caused her to form the conclusion she had reached in regard to her mental condition; that she was flighty, going from one thing to another; that she could not carry on a connected conversation very long; that "she would talk on subjects, and then jump off on something else that was not at all in keeping with the conversation she was pursuing previously."

Miss Pauline Elsby testified: That during the summer and fall of 1916 she was with Mrs. Brown quite often. That during the last sickness of Mrs. Brown that fall she was with her every night or every other night. That she sat up with her. That Mrs. Brown became sick some time in September, 1916, and died the 5th or 6th of November, 1916. That from her observation Mrs. Brown was not physically or mentally very strong. That she would frequently speak of the wind talking to her. That she would hear the windows rattle and say they were talking to her. That they would say, "Come home, Miss Ann, come home." That when she was talking about the wind saying "Come home," she didn't think she was at home all the time; that she did not know where she was part of the time. That while she was sick she thought she was

in some kind of an institution for girls, and frequently would "say to the girls to come in and visit her, and she was looking for them to come back; that was, crazy like." That Mrs. Brown never knew her own clothes. That she would beg the witness to go and hunt up her clothes and dress her in them. That the clothes she mentioned she did not have. That from the witness' observation of Mrs. Brown during the period of time she knew her, and especially during her last sickness, she would say Mrs. Brown was of unsound mind. That she did not think Mrs. Brown was capable of attending to business of any sort.

Miss Frances King, who had known Mrs. Brown about 3 years, and who visited her two or three times a week, testified that in Mrs. Brown's last sickness she did not know her own clothes. That one time during her last sickness Mrs. Brown did not know the nightgown she had on. That Mrs. Brown said, "That is not my nightgown; I know that." That witness replied, "Of course it is," and Mrs. Brown said, "No it is not; I have somebody else's nightgown on." This witness further said Mrs. Brown was childish, and that by childishness she meant "an undeveloped child—decidedly undeveloped. She was decidedly unsound; you could see that very plainly by looking at her."

Mrs. Ernest Brown, who had known Mrs. S. A. Brown, the testatrix about 25 years, and who had seen much of her, testified: That the testatrix was old, frail, and feeble-minded. That on one occasion, while the witness was visiting the testatrix, she rushed into the room very much excited and looking wild, and said there was somebody or something in the house, when there was no such cause for alarm. That testatrix would get up in the night and try to play the organ, but could not because she did not know anything about music. That some time she would try to sing, but that she was very weak and had no voice. That she thought all the time there was supernatural power about the place. That she had the idea that people had a supernatural power over her, and if she came in the presence of such people she would become very weak, and would scarcely be able to move. That in her conversation she would stop and say, "Do you see certain things out of the window?" That she said one morning, "It is a funny thing; you know I saw Maud (who is Mr. Bradshaw's wife) just as plain;" and that on being told she was mistaken, that she just imagined she saw Maud, she replied, "No; I saw her just as plain as I see you;" and then described how Maud was dressed. That the testatrix thought the flowers and chickens talked to her. That in the month of August, just preceding her death, she wanted to go to Virginia, but was too weak and sick to go. That after she found out she could not go she said: "The old hen told me, No; you will not go to Virginia." That she said

the flowers told her they were tied up too tight against the wall, and told her to turn them loose. That she would be talking and break off and say, "Look at that cloud, don't you see that cloud looks like an angel?" That from her observation of Mrs. Brown she concluded she was certainly of unsound mind. That on the day the will was written the testatrix was very nervous and very much excited.

F. A. Brown, the testatrix's husband, testified that he married the testatrix in 1884; that he thought she was in good health and mentally sound at that time; that she began to have trouble in 1887 or 1888, when they thought she was pregnant; that she had an enlargement of the womb, and milk came in her breasts, and that probably about the time for her delivery it all passed off, and from that time on she was mentally deranged; that from that time she was not of sound mind; that when she died she was 79 years old; that he went to town the day the will in question was written, and when he got home that evening he learned that the proponent, Will Bradshaw, had got his father-in-law, Mr. Wright, and a lawyer, Mr. Eades, and that "they had made the will"; that one night after that he, witness, was sitting up with the testatrix and she called him and said, "Mr. Brown, I want to give Annie Bradshaw (one of her nieces in Oklahoma), a coat of mine," and that he remarked that he thought she had made a disposition of her things, and that she replied, "These men came out here, and was in here, but I don't know what they done." This witness further said that he had never seen the will until he saw it in the courtroom; that they never told him what was in it; that he would ask the testatrix about it, and she would say, "I don't know what I was doing; I don't know what I was doing;" that there was never any trouble between him and his wife, but that during the last year of her life she concluded that he had supernatural power over her, and that he could control anybody he wanted to perfectly, and claimed that was a part of her trouble; that his married life was pleasant until his wife's mind became dethroned; that after that he was always uneasy about her; that he was afraid she might commit suicide; that the night before the will was made his wife was a perfect wreck; that the proponent mentioned the will to him a few days after his wife died, but did not tell him what was in it, or where he had it; he just said, "You are not hurt none by the will."

Other witnesses stated that in their opinion the testatrix was of unsound mind, and related the facts upon which such opinion was based, but we shall not undertake to state in detail their testimony. In addition to the oral testimony of the witness the statement of facts contains certain writings of the testatrix called "exhibits." Whether they were taken from a diary kept by her or found in some other form does not appear. These exhibits cover about 75 pages of the record, the following being a literal copy of a few of them:

"July 31, Thirsday the 30 Mr. Brown plowed in the botom field. Friday (31) morning abot 4 o'clock what a grand seen there was in the East Elements the rays from the sun shurely there was a host of angels there shurely it must have been Moses and our Savior and a host of angels. August 3, 1891. Oh how bad I felt that morning August 13, O how I do feel this morning I feel like I could not stay here any longer.

"No wonder we have sorrows and wounds in the heart. Oh who is the spiritual Robber Oh my God ceep us near The always. Cannot the righteous see and behold this—

"If any man will do his will he shall know of the doctrine whether it be of God or wheather I speak of myself. He that speaketh of himself—

"Seeing ye have purified yore souls through the spitit what did the—

"1891—May 1. I, Mr. Brown went to Sunday —— Ernest stayed at home. After I fixed dinner, I went to my room I felt tired, wearye, lay down on the bed. O how bad I—

"May 10, 1892. The Heavens shall declare the glory of God and—

"Oh my God in the name of Jesus has it not been my desire to build up everybody in Grace but I am against—

"August 1891.

"Friday Morning 7, what a combat I had with a snake. Mr. Brown, Ernest cilled the snake threw it down in the yard untill they eat there breakfast I went in the south room as usual to pray I was before the window, I looked out and I saw a cloud looked like the snake they had cilled comeing from the Southwest toward the East there came up a shower of rain the cloud came from the North and went around East it was about 9 o'clock. It seemed there was a spirit a work against me, I was praying as I went while it was raining I looked out toward the sun there was three men, one looked like he had a crown on his head, the cloud next to his head was dark, the edg was yellow, I was so elated one the sight, I thought shurely it was our Savior and the appostels it was different from anything I ever saw, the light streamed down over them from the Sun: looked like a host of Angels a little space from them, Oh what a grand sight it was.

"Oh how little we pay any attention to Heavenly things some weeaks ago after I lay down at night I saw or rather a vision, a fine car passed my view and when my coach came sailing back what a Grand crew was on board Meet me Oh glory forever, Oh I am so glad I put my trust in the Lord and not in man.

"After night I felt that I could hear someone talking and one said I have crossed the waters.

"February 1, 1904. In the morning Oh to see my Savior in Glory.

"January 28, I have crossed the waters now.

"How strange I felt, a light went up, I saw someone, I saw something looked like someone in Jewels.

"I have went into the bath room often to listen to the wind how dolefull it sounded but this time it sounded like musick, it seemed to me

like it every was musick. This is February the 7, no dolefull sound has come back yet."

[6] What has been stated is enough, we think, to show that the jury was justified in finding that the testatrix, Mrs. Brown, at the time the will offered for probate was executed, did not have sufficient testamentary capacity to make a valid and binding will.

This conclusion renders it unnecessary for a proper disposition of the appeal for us to determine whether or not the evidence was sufficient to authorize the jury's finding that Mrs. S. A. Brown, at the time of making the will, was unduly influenced thereto by the proponent, W. A. Bradshaw; will say, however, that we are inclined to the opinion that it was not.

In connection with the issue of testamentary capacity submitted, the court instructed the jury as follows:

"By testamentary capacity as used in this charge is meant that the testatrix can comprehend the property that she is about to dispose of, the objects of her bounty, the meaning of the business in which she is then engaged and the relation of each of its factors to the other."

This definition of "testamentary capacity" was objected to by the appellant, and the following special charge asked in lieu thereof:

"By testamentary capacity as used in this charge is meant: that if the mind and memory of the testatrix, Mrs. Brown, at the time of the execution of the will in question were sufficiently sound to enable her to know and understand what she was doing and the effect of her act, she had testamentary capacity; that is to say, the capacity to understand the nature and extent of the property being disposed of and to know the natural objects of her bounty, that is who her relations were and those to whom she desired her property to go.

"Mere old age and sickness producing mental and physical weakness does not necessarily deprive a person of testamentary capacity.

"The law does not require one to possess a vigorous mind and strong memory to enable her to make a will, but it is necessary that the maker of a will possess the capacity as hereinbefore set forth."

[7, 8] This special charge was refused, and its refusal is assigned as error. The only proposition advanced is that—

"The special facts of this case required a charge on old age and sickness; that mental and physical weakness arising therefrom would not in itself deprive the testatrix of testamentary capacity."

The charge was requested as a whole, and in our opinion was properly refused, for the reason that a part of it at least is upon the weight of the evidence. While it may be conceded, as stated in the second clause of the charge, that mere old age and sickness producing mental and physical weakness does not necessarily deprive a person of testamentary capacity, yet it is unquestionably true that mental incapacity may be inferred from an enfeebled condition of the mind and body. So it has been held in this state that the condition of one's health may be considered in determining the question of mental capacity, and that, though insanity may not exist, the mind may be so enfeebled as to create mental incapacity to transact business. Johnson v. Railway Co., 36 Tex. Civ. App. 487, 81 S. W. 1197. It was the contestant's right to have the evidence, as a whole, considered by the jury in determining the issue of testamentary capacity, and it would have been improper for the trial court to select some portions of it which, in and of itself, would have some probative force in determining that issue, and by instructions minimize it "to the point of its probative force when standing alone." Such would have been the effect of the requested charge had it been given. That the testatrix was very old, was sick, and in an enfeebled condition of body and mind were matters to be considered by the jury, and it was not proper for the court to take them up in his charge and treat them in their probative force as if standing alone, even though standing alone they would not have justified the jury in finding lack of mental capacity.

[9] It is error to conclude that every statement made by the court in discussing and passing upon the sufficiency or insufficiency of certain evidence to justify a particular finding in a given case should be incorporated into instructions given as a guide to the jury in determining the probative force of the testimony submitted for its consideration. Edelstein v. Brown, 95 S. W. 1126; Id., 100 Tex. 403, 100 S. W. 129, 123 Am. St. Rep. 816; Philpott v. Jones, 164 Iowa, 730, 146 N. W. 859; Campbell v. Campbell, 215 S. W. 134; Gallagher v. Neilon, 121 S. W. 564. In the last case cited this court said that—

It "was improper for the [trial] court * * * to single out any one fact, * * * and by too prominently placing the same before the jury, unduly impress them with the idea of its importance. Likewise it would be error to instruct the jury that a certain inference could or could not be drawn from a particular fact or condition, when such inference must be drawn from all the facts and circumstances in the case relative thereto."

[10] It is argued that the trial court's definition of "testamentary capacity," which appears above, is "meaningless, vague, and impossible to understand when applied as a measure of soundness of mind to the facts of the case." However this may be, there is no assignment of error presented in appellant's brief complaining of this instruction on any ground whatever. The only complaint is that the court erred in refusing the special charge quoted. This being true, we are not called upon to determine whether the court's definition of testamentary capacity is correct, and therefore express no opinion in regard to it. Not being assigned as error in this court, it

must be here held that appellant has waived whatever imperfection there may be in it.

As the case comes to us we see no escape from the conclusion that the judgment of the lower court should be affirmed; and it is so ordered.

Affirmed.