# NO. 12-18-00184-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE MATTER OF THE ESTATE* | *§* | *APPEAL FROM THE* |
| *OF VEDA JEWEL DURGIN,* | *§* | *COUNTY COURT AT LAW* |
| *DECEASED* | *§* | *VAN ZANDT COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Joyce Gercak, independent executrix of the estate of Veda Jewel Durgin, appeals from the trial court's judgment, rendered in conformance with the jury's verdict, ordering that Veda's July 25, 2007, will not be admitted to probate. In five issues, she raises charge error and attacks the sufficiency of the evidence supporting the jury's determinations that Veda lacked testamentary capacity and that she signed the will as a result of undue influence. We affirm.

## BACKGROUND

On November 9, 2006, Veda executed a will leaving her estate to her three children, Joyce, John, and Joe. John was killed in a car accident in June 2007. On July 25, 2007, Veda executed another will, leaving everything to Joyce and Joe. Veda died on March 17, 2015, and Joyce offered the 2007 will for probate. John's sons, Joey and Jordan,[1] filed a contest to the will asserting that, at the time the will was executed, Veda did not have testamentary capacity, she was under the undue influence of Joyce, the will was not properly executed, and the will was procured by fraud.[2]

---

[1] In their brief, Contestants/Appellees assert that John's three sons contested the will but one son, John Christopher, died while the contest was pending, and he is represented in the case by his mother, Susan Royal. While, in the opening fact paragraph of the trial court's final judgment, the name Susan Royal as Administratrix of the Estate of John Christopher Durgin is included as a contestant, we note that neither the original contest of will nor the second amended contest of will mentions John Christopher or Susan Royal. In support of their facts, Appellees' brief references Proponents' Exhibit 6, which is the contest of John E. Durgin's will, not the contest of Veda's will.

[2] The Contestants withdrew the allegation of lack of proper execution, and the trial court granted a directed verdict on the fraud issue.

After hearing the evidence, the jury determined that Veda lacked testamentary capacity at the time she signed the will and that she signed it as a result of undue influence. The trial court rendered judgment that the July 25, 2007, will not be admitted to probate.

**TESTAMENTARY CAPACITY**

In her fourth and fifth issues, Joyce asserts that the evidence is legally and factually insufficient to support the jury's determination that Veda lacked testamentary capacity when she signed the 2007 will. She asserts the record lacks any evidence addressing testamentary capacity at the time Veda made her will, the contestants did not prove a persistent lack of testamentary capacity, and there is no evidence of any persistent condition that would have vitiated Veda's testamentary capacity.

**Standard of Review**

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 860 (Tex. App.−Tyler 2013, no pet.). In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports it. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.−Houston [14th Dist.] 2013, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id*. If there is any evidence of probative force to support the finding, i.e., more than a scintilla, we will overrule the issue. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005).

When a party challenges the factual sufficiency of the evidence supporting a finding for which he did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Cain*, 709 S.W.2d at 176. The jury is the sole judge of the credibility of the witnesses and the

2

weight to afford their testimony. *City of Keller*, 168 S.W.3d at 819. The jury may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *Id*. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so. *Id*.

## Applicable Law

For a will to be valid, the testator must be of sound mind when she signed the will. *In re Estate of Trawick*, 170 S.W.3d 871, 876 (Tex. App.–Texarkana 2005, no pet.). That is, she must have testamentary capacity. *Id*. Where the contestants file their contest after the will at issue has been admitted to probate, the burden of proof is on them to establish the testator lacked testamentary capacity. *Id*. Testamentary capacity means sufficient mental ability, at the time of the execution of the will, to understand the business in which the testatrix is engaged, the effect of her act in making the will, and the general nature and extent of her property. *In re Neville*, 67 S.W.3d 522, 524 (Tex. App.–Texarkana 2002, no pet.). Additionally, the testator must know her next of kin and the natural objects of her bounty, and the testator must have a sufficient memory to collect in her mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them. *In re Estate of Trawick*, 170 S.W.3d at 876.

The relevant inquiry is the condition of the testator's mind on the date the will was executed. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). Absent direct evidence indicating the testator lacked capacity on the date of execution, the testator's mental condition on that date may be determined from lay opinion testimony based on witnesses' observations of the testator's conduct prior or subsequent to the execution of the will. *Id*. However, evidence of incompetency at other times is probative of incompetency on the date of the will's execution if some evidence demonstrates that condition persists and has some probability of being the same condition which existed on the date the will was made. *Id*.

## Analysis

No one contests Veda's testamentary capacity on November 9, 2006. The record contains no direct evidence of Veda's capacity on July 25, 2007, other than the attestations in the self-proving affidavit contained in the will itself. Therefore, we look to the evidence of her state of mind in the surrounding time period. *See id*.

There was considerable focus on Veda's state of mind at John's funeral in June 2007, roughly six weeks before the will was executed. Joey testified that, at John's funeral, Veda "had no clue what was going on at all." He had to repeatedly tell her that John passed away in a car wreck. He opined that, from June 2007 until her death in 2015, Veda thought John was alive. He stated that, when John died, Veda "wasn't there. She wasn't of sound mind." He described her as "very distraught." He had no information about her mental condition in the time period after John died and before she went into the nursing home in late 2007, but he did not believe she was in her right mind. Jordan testified that, at John's funeral, Veda did not know why they were there and asked where John was.

Joyce testified that Veda did not take John's death very well. She contrasted this with how well Veda had taken care of her husband, E.G., up until his death in November 2005. She noted that Veda could not remember the names of people she saw at the funeral, insinuating this was because she had not seen them in many years. Joyce also stated that Veda had a very hard time accepting John's death, was very depressed, and had difficulty functioning.

Although redacted in part by the trial judge, Veda's medical records were admitted into evidence. The pertinent medical records spanned a time period from January 25, 2007, through August 2, 2007. The jury was required to read and interpret these records without the aid of illumination by a testifying physician.

A medical record dated January 25, 2007, reflects that Veda experienced depression, memory loss, and confusion. A January 26 report noted that she has trouble with short term memory that can fluctuate, she occasionally wakes disoriented, and she repeats conversations. The doctor noted a history of "spells" that tend to happen in the fall, and stated that her memory has been progressively worsening over the years. A March 26, 2007, report noted that the chief complaint was "f/i memory, getting worse esp. short term." It goes on to explain:

> Ms. Durgin returns for a history of memory loss and prior syncopal episodes. Since her last visit, her son notes that she seems more disoriented. This seems to be occurring since starting Namenda. She has not had any additional syncopal episodes. She continues to complain of bad dreams. She denies having hallucinations. Her son has noticed that in the mornings her memory seems to be much worse. After waking, she sometimes does not recognize him. This tends to improve as the day goes on.

This March 26 report further stated: "She will likely need a change in her living environment with closer supervision, possibly assisted-living, hiring a home sitter, or even considering a nursing home. Her family is to consider these options."

On April 9, 2007, a physician indicated that Veda has had episodes of short-term memory loss. On May 8, 2007, Veda saw a specialist for a sinus problem. On that date, she was alert, oriented, and in no acute distress. A history of depression was noted.

Medical records show that Veda fell on July 26, 2007, went to the emergency room, and was discharged. She went to see a doctor in Canton on July 29. The medical record for that date recites: "Office Visit: FX R 5th Metacarpal, Dementia-worsening." The report states that she was disheveled, awake, forgetful, and answers questions but does not remember what she is told.

She was admitted to the hospital July 30, 2007, and discharged August 2, 2007. A consultation report provides that the reason for the consultation was because she "presented with a chief complaint of sudden onset of disorientation and confusion and mental status changes." The record indicates that "she had been at home and was noted to defecate and displayed marked confusion" and brought to the hospital for evaluation. The report also stated:

> There is a prior history of her having memory loss and syncopal episodes. She has been noted to have disorientation and confusion in the past, and has been noted to have hallucinations. She has been noted to have short-term memory problems and become disoriented and confused. She has been noted to sleep a lot during the day.

Under "Review of Systems," the report states: "NEURO: Reportedly her level of functioning at home has been limited." The report also included the following:

> The patient was also noted to have trouble with repeating herself and asking the same questions over and over again, and was noted to have marked short-term memory and will need to manage to do things like calls, forgetting appointments, medications. She seemed same and has had trouble doing calculations and managing her finances or balancing her checkbook. She has loss of interest in activities of daily living. Also needs help with dressing, bathing.

In spite of the phrase "sudden onset of disorientation and confusion" in the July 30 entry, the records show that she suffered from confusion on January 25, she was "more disoriented" on March 26, and her dementia was worsening on July 29. A prior history of memory loss was noted on January 25. The following day, a doctor noted that her memory has been progressively

worsening over the years. On March 26, it was again noted that her memory was getting worse while on April 9 it was noted that she has episodes of short-term memory loss. Also on March 26, four months before signing the will, it was noted that she sometimes does not recognize her son. At that time, the doctor suggested that she likely needs a change in her living environment, listing a move to a nursing home among options the family is to consider. On May 8, a month before John died, it was noted she has a history of depression. On July 29, four days after signing the will, it was noted that she was forgetful and does not remember what she was told. The same July 30 record that stated she experienced a sudden onset of disorientation and confusion also noted she has a history of disorientation and confusion, trouble doing calculations and managing her finances, and needs help with the basics, dressing and bathing. This assessment came just five days after she signed the will.

The evidence established that Veda suffered from progressively worsening memory loss for years and suffered from depression and confusion at least since January 2007. The jury could infer that Veda did not have sufficient memory to identify the elements of her business, perceive their relation to each other and form reasonable judgments about them. *See Univ. Gen. Hosp., L.P.*, 403 S.W.3d at 550; *In re Estate of Trawick*, 170 S.W.3d at 876. In March, it was noted that she sometimes did not recognize her son and might need to be in a nursing home. The jury could infer that Veda did not know the natural objects of her bounty. *See Univ. Gen. Hosp., L.P.*, 403 S.W.3d at 550; *In re Estate of Trawick*, 170 S.W.3d at 876. Five days after signing the will, Veda was unable to dress or bathe without assistance. The jury could infer that when an individual cannot perform the rudimentary tasks of bathing and dressing she could not understand the nature and extent of her property. *See Univ. Gen. Hosp. L.P.*, 403 S.W.3d at 550; *In re Neville*, 67 S.W.3d at 524. On this record, the jury could determine that Veda was incapable of exercising judgment, reason, and deliberation, or of weighing the consequences of her will. *See Bradshaw v. Brown*, 218 S.W. 1071, 1072 (Tex. Civ. App.–Dallas 1920, writ dism'd w.o.j.). The record shows that Veda's condition existed at least since early 2007 and persisted until after the will was signed. *See Lee*, 424 S.W.2d at 611. Considering this evidence in the light most favorable to the jury's finding of incompetence and indulging reasonable inferences that support it, we conclude there is more than a scintilla of evidence to support the jury's finding of incompetence. *See Hernandez*, 164 S.W.3d at 388; *Univ. Gen. Hosp., L.P.*, 403 S.W.3d at 550. We overrule Joyce's fourth issue.

6

In reviewing Joyce's factual insufficiency issue, we consider the evidence in favor of, as well as the evidence contrary to, the jury's finding that Veda was incompetent. *See Ellis*, 971 S.W.2d at 406-07. The jury heard considerable evidence regarding the family dynamics and context surrounding the signing of the will. On November 14, 2005, Veda signed a durable power of attorney appointing Joyce as her agent and authorizing her to have full power to act for Veda in all matters. In her November 9, 2006 will, Veda made specific bequests to each of her three children, John, Joe, and Joyce. There were no bequests to anyone else. John died in a car accident on June 9, 2007. In the July 25, 2007 will, Veda bequeathed all of her property to Joyce and Joe. Veda moved to a nursing home in late 2007. On December 14, 2007, Veda signed an Enhanced Life Estate Deed, also known as a Lady Bird Deed, transferring a remainder interest to Joyce and Joe while Veda retained a life estate and the power to sell the property.

In 2008, Joe needed funds for a business deal. Veda took out a $100,000 loan using her land as collateral. The loan was extended in 2010, but Joe was unable to repay the funds, so Veda sold the land to pay back the loan. According to Joyce, this was considered his inheritance. Following this reasoning, he would not have been able to inherit after Veda's death, leaving Joyce as the sole beneficiary.[3] However, the warranty deed conveying the 119.567 acres sold recites that it was for $10.00 and other good and valuable consideration, and a note in the principal amount of $1,932,000. Joyce testified that they used cash left after the note was paid to pay the nursing home. Although she testified that she "was taking care of" those funds, she did not remember how much money was left after payment to the nursing home.

Joyce testified that the Lady Bird Deed put many restrictions on Veda. Therefore, in January 2015, Joyce decided to put the land back in Veda's name so, as her agent with power of attorney, Joyce could sell the property. A special warranty deed, which cancelled the Lady Bird Deed, was executed naming as grantor Veda, acting by and through Joyce as her attorney in fact, and naming Veda grantee. However, Veda died before Joyce could sell the property. Joyce commented that by early 2015 Veda "was kind of not too with it and I didn't want her to sign anything."

Joyce's husband, Francis Gercak, testified that, at some unidentified time when he and Joyce were visiting, Veda mentioned "that she was upset and that she had redone the will." He also testified that when Veda first went in to the nursing home she recognized all of the family,

---

[3] Joe died in 2012. Therefore, Joyce was the sole beneficiary under the 2007 will at the time of Veda's death.

was happy, and would talk. However, three years later she may not have been able to recognize someone immediately. Francis testified that Veda knew what was going on at John's funeral. She talked about the family but required help remembering names of people she had not seen recently. She was like every mother who has lost a child, upset and slightly depressed.

When asked to describe her mother's physical condition in 2007, Joyce said she was getting a little bit older and was depressed. Joyce testified that Veda fully understood that John died but did not know how she was going to get along without him.

Jordan testified that after he and his mother moved to south Texas in 2003, he visited Veda about every other weekend. She recognized him, and they had normal conversation but sometimes she stared at him like she did not know what he was saying. He believed she was of sound mind when she executed the 2006 will. Jordan did not think Veda would have cut anything from the will that would have affected John's inheritance. He thought she would have protected her grandchildren's share. In contrast, Joyce testified that Veda changed her will because she was upset that John's sons sued their stepmother. They sued her for wrongful death because she was driving when John died, and they sued to recover under his life insurance policy. Additionally, they successfully contested John's will by which he left everything to his second wife, disinheriting his children.

Joyce explained that Veda fell and broke her hip and she moved to the nursing home for recovery. Joyce stated that she was about to upgrade Veda's home "so it would be easier for her to go around her house" when Veda told her that she would like to stay in the nursing home because she did not want to impose on anyone, and no one would have to worry about her. She said she was not aware of any health problems Veda may have had before her fall. Joyce wanted to sell the property so she would have money to take care of Veda in the nursing home.

The jury considered the evidence of Veda's testamentary capacity in the context of the family dynamics. There was animosity between Joyce and John's sons, Jordan and Joey. Joyce did not feel that the contestants should try to defeat the 2007 will under which Joyce inherited all that was left of the estate. Further, she sided with their step-mother in their legal disputes with her.

The jury is the judge of the credibility of the witnesses. *See* ***City of Keller***, 168 S.W.3d at 819. The jury may have chosen not to believe Joyce when she said she was not aware of any health problems Veda may have had and that she only moved to the nursing home to recover from her

8

broken hip. Likewise, the jury may not have believed Francis when he testified that Veda told him she was upset and signed a new will or that she recognized all of the family at the end of 2007. *Id*. The remainder of the evidence showing that Veda had a history of memory loss, confusion, and disorientation, including the failure to recognize her son at times, indicates that Veda did not have sufficient mental ability, at the time she executed the will, to understand her business, the effect of her act in making the will, or the general nature and extent of her property. *See In re Neville*, 67 S.W.3d at 524. Therefore, the evidence is factually sufficient to support the jury's determination that Veda did not have testamentary capacity when she signed the 2007 will. *See Cain*, 709 S.W.2d at 176. We overrule Joyce's fifth issue.

## DISPOSITION

Because the evidence is legally and factually sufficient to support the jury's finding that Veda was not mentally competent when she signed the will on July 25, 2007, it is unnecessary for us to consider Joyce's first and second issues in which she complains that the evidence does not support the jury's finding that Veda signed the will as a result of undue influence. *See Smith v. Smith*, 389 S.W.2d 498, 502 (Tex. Civ. App.−Austin 1965, writ ref'd n.r.e.); *Bradshaw*, 218 S.W. at 1075. It follows that we need not address Joyce's third issue in which she complains that the charge on undue influence was erroneous. *See* TEX. R. APP. P. 47.1.

We *affirm* the trial court's judgment.

BRIAN HOYLE
Justice


Opinion delivered August 30, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 30, 2019**

**NO. 12-18-00184-CV**

**IN THE MATTER OF THE ESTATE OF**
**VEDA JEWEL DURGIN, DECEASED**

Appeal from the County Court at Law

of Van Zandt County, Texas (Tr.Ct.No. 14,631)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that the costs of this appeal are hereby adjudged against the Appellant, **JOYCE GERCAK**, for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*