**In the ESTATE OF Viola Conner TRAWICK, Deceased.**

No. 06–04–00083–CV.

Court of Appeals of Texas, Texarkana.

Submitted May 24, 2005.

Decided Aug. 18, 2005.

Robert M. Minton, Minton & Brown, PLLC, Henderson, for appellant.

John R. Mercy, Mercy*Carter*Tidwell, LLP, Texarkana, Clay Wilder, Wilder & Wilder, PC, Henderson, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

This case is a will contest. Viola Conner Trawick, at age ninety-two, executed a self-proving will March 11, 1998, naming her sister's daughter, Reva Risinger, as independent executor and as sole beneficiary of her estate. Trawick died May 1, 2000. The will was admitted to probate May 26, 2000. On January 5, 2001, some of Trawick's grandchildren, Deborah de la Torie Shoemake, Ronnie de la Torie, Larry de la Torie, Joe Dan Hamilton, Teresa Coffin, Danny Hamilton, Bobby Hamilton, Tracy Hamilton, and Anita Hamilton (the contestants) filed a will contest, alleging Trawick lacked testamentary capacity, or alternatively, that Trawick signed the will as a result of Risinger's undue influence. The case was tried before a jury. After the evidence was closed, the trial court sustained Risinger's objection to submitting the issue of undue influence to the jury. The contestants do not complain of this action on appeal. The jury found that Trawick did have testamentary capacity March 11, 1998, and awarded Risinger her attorney's fees. The trial court rendered judgment on the jury's verdict.

The contestants appeal, alleging two points of error. Their first point concerns the testimony of Ted LeDet, a medical doctor, called by Risinger as an expert

witness. The contestants allege the trial court erred in three ways concerning Le-Det's testimony: 1) in refusing voir dire examination of the doctor to test his qualifications; 2) in allowing the doctor to testify as to the mental capacity of Trawick; and 3) in denying their motion to strike the doctor's testimony. In their second point of error, the contestants contend the evidence supporting the jury's finding of testamentary capacity is factually insufficient. We affirm the trial court's judgment because: 1) all the complaints the contestants make concerning LeDet's testimony were waived by their failure to make a timely objection; and 2) the evidence supporting the jury's finding of testamentary capacity is factually sufficient.

### Expert Testimony

■ The trial court has broad discretion in determining whether to allow expert testimony. *McKinney v. Nat'l Union Fire Ins. Co.*, 747 S.W.2d 907, 910 (Tex. App.-Fort Worth 1988), *aff'd*, 772 S.W.2d 72 (Tex.1989); *see* Tex.R. Evid. 702. The expert evaluates the facts, and his or her evaluation must meet three prerequisites: 1) a body of scientific, technical, or other specialized knowledge must exist that is pertinent to the facts in issue; 2) the witness must have sufficient experiential capacity in his or her field of expertise; this capacity encompasses knowledge, training, and education; and 3) the facts evaluated must be within the witness' field of specialized knowledge. *Guentzel v. Toyota Motor Corp.*, 768 S.W.2d 890, 897 (Tex.App.-San Antonio 1989, writ denied). However, the weight given the testimony of an expert witness is to be determined by the trier of fact. *First City Bank–Farmers Branch v. Guex*, 659 S.W.2d 734, 739 (Tex.App.-Dallas 1983), *aff'd*, 677 S.W.2d 25 (Tex.1984).

■ Under Rule 702, scientific expert testimony must be reliable and relevant. Thus, in addition to showing that an expert witness is qualified, Rule 702 requires the proponent to show that the expert's testimony is relevant to the issues in the case and is based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554–55 (Tex.1995) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *see generally Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex.1998).

■ A party has two fundamental options to preserve a complaint concerning an expert's testimony: object to the testimony before trial or object when it is offered. *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex.2002); *Maritime Overseas Corp.*, 971 S.W.2d at 409. Here, the contestants did neither.

LeDet's deposition had been taken by the parties, so the contestants were apparently aware of his qualifications—or lack thereof—and the opinions he would be expected to express at trial. Nonetheless, no pretrial motion was filed—and no pretrial hearing held—challenging LeDet's qualifications or opinions. The contestants waited until LeDet had begun his testimony at trial to raise any question concerning his qualifications. The context of that initial challenge was as follows:

[CONTESTANTS' COUNSEL]: Your Honor, at this time, we'd like to take Dr. Le Det on voir dire examination before we go any further.

[RISINGER'S COUNSEL]: What is the purpose, Your Honor?

THE COURT: And the reason?

[CONTESTANTS' COUNSEL]: The purpose is going into any qualifications for the subject matter of this proceeding we're in here today.

. . . .

[CONTESTANTS' COUNSEL]: He's not been shown as a specialist in the field of psychiatry or trained in psychiatry or anything of that kind.

THE COURT: I think that's premature. And so, before—I'll give you an opportunity to go into those matters before his opinion as a dissident [sic]....

The contestants cite Rule of Evidence 705 as authority for their contention the trial court erred in denying their voir dire examination. That rule provides, in relevant part, as follows:

(b).... Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall, or in a civil case *may*, be permitted to conduct a *voir dire* examination directed to the underlying facts or data upon which the opinion is based....

(c).... If the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion ... the opinion is inadmissible.

TEX.R. EVID. 705(b), (c) (emphasis added).

■ The contestants' request to voir dire the witness for the purpose of "going into" his qualifications did not invoke these rules pertaining to inquiry into "the underlying facts or data" on which the expert's opinions are based. Even if it did, Rule 705(b) clearly makes such voir dire discretionary in a civil case. The use of the word "may" creates discretionary authority in the trial court. TEX. GOV'T CODE ANN. § 311.016(1) (Vernon 2005).

Further, contrary to the contestants' contention, the trial court did not refuse their request to voir dire the witness; it merely ruled that such request was premature. The contestants never renewed their request and made no objections to the following testimony by LeDet on direct examination:

[RISINGER'S COUNSEL]: And based on your assessment of her in October of '97 and your assessment of her in October of '98, do you have an opinion that in March of '98 she would have had the mental ability to understand the making of a will?

[LeDET]: There is nothing from my recollection or in the notes that I have about Mrs. Trawick that would suggest that she could not understand and do—make a will or understand her finances.

....

[RISINGER'S COUNSEL]: Back in the '97, '98 window that we talked about. Really any time leading up to February, 2000, in your opinion did she have sufficient mental capacity to make a will?

[LeDET]: Yes, sir. The '97, '98 time frame. Yes, sir.

[RISINGER'S COUNSEL]: And again, is that based on your years of training and medical experience that you told us about?

[LeDET]: Yes, sir.

....

[RISINGER'S COUNSEL]: Doctor, have your opinions expressed today been based on reasonable medical probability?

[LeDET]: Yes, sir.

The contestants cross-examined LeDet concerning his opinions, but never asked any questions concerning his qualifications. It was only after LeDet had been excused as a witness and Risinger rested her case that the contestants then moved the trial court to strike LeDet's testimony. Such motion came too late. *See Rodgers v. State*, 162 S.W.3d 698, 707 (Tex.App.-Texarkana 2005, pet. filed).

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, unless such grounds are apparent from the context. *See* TEX.R.APP. P. 33.1(a); *see also* TEX.R. EVID. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *See Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991). The Texas Supreme Court directly addressed the waiver issue in this context in *Maritime Overseas:*

> Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush....
>
> Reviewing courts may not exclude expert scientific evidence after trial to render a judgment against the offering party because that party relied on the fact that the evidence was admitted.

*Maritime Overseas Corp.*, 971 S.W.2d at 409.

Here, the contestants' objection to LeDet's testimony was untimely; hence, it was waived. Their first point of error is overruled.

**Sufficiency of the Evidence**

Citing Rule 38.1(h) of the Texas Rules of Appellate Procedure, Risinger suggests the contestants have not properly briefed their contention that the evidence supporting the jury's finding of testamentary capacity is factually insufficient. We agree, but will address their contention in the interest of justice.

*Standard of Review*

Because the contestants filed their contest after the will at issue had been admitted to probate, the burden of proof was on them to establish Trawick lacked testamentary capacity. *See In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex.App.-Corpus Christi 2004, no pet.). When the party having the burden of proof challenges the factual sufficiency of a finding in the trial court, that party must show that the jury's finding was against the great weight and preponderance of the evidence. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983); *Murphy v. Fannin County Elec. Coop.*, 957 S.W.2d 900, 903 (Tex.App.-Texarkana 1997, no pet.). The court of appeals must consider and weigh all the evidence, and may set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Murphy*, 957 S.W.2d at 903.

*Testamentary Capacity*

To make a valid will, Trawick must have been of sound mind when she signed the will. Texas courts define the term "sound mind" to mean "testamentary capacity." "Testamentary capacity" means sufficient mental ability to understand the business in which the testator is engaged, the effect of his or her act in making the will, and the general nature and extent of his or her property. *In re Neville*, 67 S.W.3d 522, 524 (Tex.App.-Texarkana 2002, no pet.). The testator must be able to know his or her next of kin and the natural objects of his or her bounty, and the testator must have a sufficient memory to collect in his or her mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them. *Id.; In re Estate of Jernigan*, 793 S.W.2d 88, 89 (Tex.App.-Texarkana 1990, no writ).

■ The proper inquiry in a will contest on the ground of testamentary incapacity is the condition of the testator's mind on the day the will was executed. When there is an absence of any direct testimony of acts, demeanor, or condition indicating that the testator lacked testamentary capacity on the date the will was executed, the testator's mental condition on that date may be determined from lay opinion testimony based on the witnesses' observations of the testator's conduct either prior or subsequent to the execution. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex.1968). However, only that evidence of incompetency at other times has probative force which demonstrates that condition persists and "has some probability of being the same condition which obtained at the time of the will[']s making. . . ." *Id.*

*The Contestants' Evidence*

■ Sondra Gray, Trawick's hairdresser and long-time acquaintance, testified that, during the year 1996, Trawick's "mind was not what it should be and she often accused her best friend of [stealing things from her home]." She also testified Trawick imagined there were children in her house and stated to Gray they kept her awake at night and "[t]hey just about drove her crazy." Gray further testified that Trawick would speak of persons who were deceased as if they were living and that Trawick would get confused about when she was supposed to come into the beauty shop for her appointment. Gray acknowledged that on some days Trawick would be in "perfectly good condition" and that she had no idea what her condition was on the day she made her will.

Yvonne Cobbs, who had been acquainted with Trawick for fifty years and visited her monthly, testified that the deaths of Trawick's son in 1989 and granddaughter in 1997 "turned her mind and her brain off to a certain degree to have to endure . . . [t]hese shocks." She also testified as to Trawick's further mental deterioration after Trawick's daughter, Winona de la Torie, died in August 1997. It was Cobbs' opinion that, in the fall of 1997, Trawick "wasn't really mentally able or capable of carrying on any kind of business such as making a will or anything like that." Cobbs acknowledged, however, she did not know how Trawick "appeared to be" on March 11, 1998, the date she signed the will at issue. Cobbs further testified that, to her knowledge, Trawick was never diagnosed with any kind of mental condition or problem.

Teresa Hamilton, one of the contestants, testified that, during the fall of 1997, when she was staying with Trawick, she became concerned about Trawick's mental condition because on some days "she was extremely confused, and she would hide things." However, Teresa[1] further testified that, during the period of about mid-February to the end of March 1998, Trawick had mental capacity to sign a legal document granting Risinger power of attorney.

Eula Ray Rodrigues testified she had known Trawick for fifty to sixty years and was sometimes paid to sit with her. She testified as to Trawick's deteriorating mental condition during the period from around August 1997 through March 1998. She gave specific examples, such as Trawick not being able to recognize people she knew well (including some of her relatives), and Trawick saying that certain people never came to see her when they

---

**1.** First names are used in this opinion, when appropriate, to distinguish such persons from others who share the same last name.

had done so. Rodrigues acknowledged she was not aware of Trawick's mental condition on the day she signed her will.

Toni Maher is a business person in Mt. Enterprise, where Trawick lived, and testified she knew Trawick for approximately ten years. She further testified concerning a social event where Trawick had difficulty recognizing people and concerning another occasion when Maher delivered flowers to Trawick's house and had difficulty making Trawick understand that the flowers were for her.

Emmett Case testified that he leased Trawick's land for pasture and that in January 1998 Risinger told him to give the lease check to her (Risinger) instead of Trawick because Trawick was "not real competent with herself" and might misplace it.

David Collins, a police officer, testified that in 1991 Trawick reported her car as stolen when she had left it on a parking lot at the local community center.

Mike Coffin testified that, sometime after Winona died, he and his wife lived in Trawick's home and helped take care of her until around March or April 1998. He further testified there were times when Trawick would have a lapse of memory. Specifically, he said she would insist on going to the bank to make deposits she had already made. He testified there were times when Trawick failed to recognize him, even though he was living in her home. Coffin admitted, however, that he considered Trawick mentally competent when she made an earlier will in late 1997 naming his then wife, Teresa, as executor.

Lana Porter worked in a grocery store in Mt. Enterprise and testified that, in March or April 1998, Trawick came to the store and tried to cash checks that had already been cashed. She described Trawick as "a sweet little lady but just had no idea of what was going on around her."

Eunice Mae Mashburn played dominoes with Trawick. She testified that, after Winona died, Trawick became forgetful and confused and eventually dropped out of the domino playing group.

Janice Lane testified Trawick was her great aunt. She said that in 1998 Trawick asked Lane why Winona never came to visit Trawick. Lane also testified about Trawick calling on the telephone during the summer of 1997 and telling Lane it was snowing outside. Lane described Trawick's mental condition as "gradually getting worse and worse," beginning around 1997.

Marilyn Matlock was employed to stay with Trawick and was so employed until January 1997. Matlock testified Trawick would often forget who Matlock was and asked her when Winona was coming home. Trawick also confused Matlock with other people. Trawick asked Matlock about her own deceased mother as if she were still living.

Carolyn Hemphill, Matlock's twin sister, testified that, from 1997 to 1998, Trawick often called Hemphill on the telephone and asked her where she lived, when Trawick already knew where Hemphill lived. Hemphill testified that several times Trawick would leave her home and need help finding her way back.

Tory de la Torie, the wife of one of the contestants, Ron de la Torie, stayed with Trawick just before Winona (Tory's mother-in-law) died in August 1997. Tory testified Trawick did not recognize people out in public. Tory further testified Trawick accused sitters of stealing her dishes. Tory also testified regarding a bizarre incident that occurred in Trawick's home when Trawick was sitting in the hallway removing her clothes in the middle of the

night. Tory also testified she had difficulty getting Trawick to bathe, which she said was very uncharacteristic of Trawick.

Joe Jesse de la Torie, the father of some of the contestants, testified that, although he was divorced from Winona, he and Trawick continued a "very good" relationship until Trawick's death. He testified Trawick's behavior worsened from 1997 until the time of her death. He said that her condition worsened as members of her family died and that she "seemed to be disoriented" after the death of his divorced wife, Winona. He confirmed Trawick talked about people who were deceased as if they were living.

Gene Shoemake, the husband of Deborah de la Torie Shoemake, testified that, in the latter part of the year 1997, he and his wife moved to Mt. Enterprise. He testified they eventually lived next door to Trawick. He said he had frequent opportunities to observe Trawick's demeanor from 1989 until the time of her death in 2000, and during this period her mental condition "got worse." He admitted, however, there were "good days and bad days," "good periods and bad periods," but agreed that, even on the "good days," he did not feel she returned to what he considered her "normal" behavior. He described Trawick talking about dead people as if they were living. He said she talked about strange people living in her house and stealing her blankets. He also testified Trawick complained to him about children playing on her porch at night and keeping her awake; he went to check, but never saw anyone. He testified he found canned food hidden in dresser drawers in Trawick's house.

Deborah testified that in February 1998 Risinger said she did not feel Trawick was competent to change her will. Deborah further testified that Trawick did not know what she was doing a lot of the time. She said that, before Winona died in 1997, Trawick was "already becoming confused" and that her condition never improved, but got worse. She testified there were times when Trawick was "okay" and times when she was "not okay." Deborah acknowledged she was unaware of Trawick's mental fitness on the date she signed the will in issue.

Ron de la Torie testified that after Winona died Risinger told him Trawick was not "in her right mind." He described Trawick's mental health and condition in 1996 as "less than normal." When asked if he thought his grandmother was mentally capable of signing a will March 11, 1998, he answered, "Absolutely not."

## Risinger's Evidence

Risinger testified she started taking care of Trawick because other members of the family asked her to and because of a promise she had made to her cousin, Winona. She said that, a few days before execution of the will in issue, she, at Trawick's request, drove Trawick from her home in Mt. Enterprise to Henderson to see her attorney, Joe Shumate. Risinger further testified she remained in the waiting room while Trawick met with the attorney. Shumate testified that, during this visit, Trawick specified how she wanted her will to be written and that he prepared the will in accordance with her specifications. Shumate further testified Trawick later returned to his office and executed the will March 11, 1998. Risinger testified that she, at Trawick's request, drove her to Shumate's office for the signing of her will. Risinger admitted, and one of the witnesses to the signing of the will confirmed, that Risinger was present when the will was signed. The same witness to the signing of the will further testified that after the signing the will was delivered to Trawick. Risinger testified she then drove Trawick to the bank, where Trawick

placed the will in a lockbox. Risinger said she waited in the lobby of the bank while Trawick did this. Shumate, the two witnesses to the signing of the will, and the person who notarized the signatures, testified that, at the time Trawick signed the will, she appeared mentally competent, not confused, appeared to know what was going on, and understood what she was doing.

John Webb, a long-time acquaintance of Trawick, testified he played dominoes with Trawick and never saw her exhibit any behavior that caused him to be alarmed. Wynell Webb, John's wife, also a long-time acquaintance of Trawick, testified that, in all Wynell's association with Trawick, she appeared to be mentally competent. Wynell attended Trawick's ninety-fourth birthday party, where she called Wynell by her name and conversed normally with her.

Geneva Craycraft, an acquaintance from Trawick's church since 1970, observed Trawick conversing with other people and enjoying her ninety-fourth birthday party. Ben Craycraft, Geneva's husband, and Barbara Watson, acquaintances from church, observed Trawick to be the same every time they met her during the 1997–1998 time period.

Joy Gregg, a former employee of Citizens Bank in Mt. Enterprise, testified that Trawick was of sound mind and that, had it been otherwise, she would have never done business with her. Trawick did her own banking, even though Risinger would drive her to the bank.

LeDet, in addition to the testimony described above, also testified Trawick was doing very well when he examined her in 1994 and she was not on any medication. He further testified he did not see her again until about two and a half years later when she came to him complaining of a headache. He testified that a neurological examination was unremarkable and that her headache was resolved with minimal therapy. Trawick's medical record from the doctor's visits in late 1997 and 1998 indicate Trawick was aware and expressive of her opinion, including consent to certain tests while refusing others. LeDet testified it was not until February 2000 that Trawick became combative and confused. She was eventually diagnosed with and treated for "sundown syndrome." The doctor testified that persons suffering from this syndrome "may do well during the day but as the sun goes down they tend to have more problems with confusion."

*Analysis*

After considering and weighing all the evidence, we cannot say the evidence supporting the jury's finding that Trawick did have testamentary capacity March 11, 1998, is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. While the contestants' evidence did show that some of Trawick's conduct (both before and after that date) was senile, eccentric, and even bizarre, there was no evidence any of that conduct persisted and "ha[d] some probability of being the same condition which obtained at the time of the will[']s making." *Lee,* 424 S.W.2d at 611. Some of the contestants' witnesses acknowledged that, on some days, Trawick would be in "perfectly good condition" and that there were times when she was "okay" and times when she was "not okay," that she had "good days" and "bad days." Some of these witnesses also admitted Trawick had the mental capacity to sign another will and a power of attorney only a few months before she signed the will at issue. Accordingly, we conclude the contestants failed in meeting their burden of proving that Trawick lacked testamentary capacity

March 11, 1998. Their factual sufficiency point is overruled.

## Conclusion

We affirm the trial court's judgment.