# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00186-CV

---

### D. L. E. B., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
### NO. 18-FL-250, CHRIS SCHNEIDER, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

In this appeal from the trial court's order terminating D.L.E.B.'s parental rights to her child, L.J.B., the only issue is a challenge to the trial court's denial of D.L.E.B.'s request to conduct a Rule 705(b) examination of an expert witness. *See* Tex. R. Evid. 705(b) (before expert states opinion, trial court may permit party to examine expert outside jury's hearing about facts or data underlying expert's opinion). We will affirm.

### BACKGROUND

In June 2018, the Department was informed that D.L.E.B. and an unrelated household member had tested positive for cocaine.[1] The Department's investigator, Christine

---

[1] The Department had ongoing investigations into the family related to two other children. D.L.E.B. had extensive involvement with the Department dating back to 2002 related to allegations of abuse and neglectful supervision of four of L.J.B.'s siblings. The court had

Timmons, checked the drug testing website and verified that the reported test results had been posted. Timmons went to D.L.E.B.'s home to check on L.J.B.'s welfare. L.J.B. was approximately one year old and living with D.L.E.B. and her husband and L.J.B.'s presumed father, M.B. When Timmons arrived, D.L.E.B. was not at home, but Timmons spoke with M.B., who reported that he was not sure whether D.L.E.B. was using illegal substances. When Timmons informed M.B. of the drug test results, M.B. stated that he was concerned because D.L.E.B. was L.J.B.'s primary caretaker. M.B., who was 83 years old, told Timmons that he could not care for L.J.B. by himself and that he believed it would be best if Timmons took L.J.B. into custody. Timmons then contacted D.L.E.B. by telephone. D.L.E.B. stated that she would be home shortly. When D.L.E.B. arrived at the home, Timmons told D.L.E.B. about the positive drug test. D.L.E.B. stated that M.B. had given her money about ten days earlier and that she had used that money to buy cocaine. M.B. denied that he knew D.L.E.B. was going to buy drugs with the money, but D.L.E.B. stated that M.B. knew what she intended to do with it. After D.L.E.B. acknowledged that she had used cocaine five times that month while she was caring for L.J.B., Timmons asked if D.L.E.B. would take an "instant drug test." D.L.E.B. agreed and stated that the drug test would be positive for cocaine, which it was. Timmons asked D.L.E.B. if there was anyone else who could supervise her and L.J.B. D.L.E.B. could not provide the name of anyone who could help care for L.J.B., and M.B. reaffirmed that he could not care for her himself.

Timmons then stepped outside the house to call Department supervisor Kelli Johnson. While Timmons was outside, neighbors approached Timmons and told her they were

terminated D.L.E.B.'s parental rights to two of those siblings, and the remaining two had been placed in foster care.

concerned for the child.  The neighbors stated that D.L.E.B. had been seen with a known drug dealer in the neighborhood and that they were concerned she was using drugs.  Johnson told Timmons that the on call program director had given an approval for an exigent removal of L.J.B. from the home without D.L.E.B.'s signature based on D.L.E.B.'s drug use and M.B.'s statements that he would not be able to recognize whether D.L.E.B. was using drugs and that he was unable to care for L.J.B.  Timmons went back inside the house and informed D.L.E.B. of the Department's intent to take L.J.B. into custody.  D.L.E.B. told Timmons that "she knew this was going to happen" and that she had only "slipped" and was not really a drug user.  Timmons explained the Department's concern for L.J.B. because D.L.E.B. was the child's primary caregiver and was under the influence of cocaine.  D.L.E.B. told Timmons that she understood and would work any services necessary to regain custody of her daughter.

On June 28, 2018, the district court signed an order appointing the Department L.J.B.'s temporary managing conservator and D.L.E.B. and M.B. as L.J.B.'s temporary possessory conservators with court-ordered periods of access and possession.[2]  L.J.B. was placed with foster parents.  In July 2018, the Department moved for a finding of aggravated circumstances.  *See* Tex. Fam. Code § 262.2015 (providing for waiver of requirements of service plan and reasonable efforts to return child to parent and for accelerated trial schedule if court finds that parent has subjected child to aggravated circumstances).  The Department stated that, since taking L.J.B. into custody, two separate hair follicle tests performed on L.J.B.'s hair tested positive for cocaine at extremely high levels.  At the hearing, L.J.B.'s attorney ad litem elicited

---

[2]  The court later dismissed M.B. from the case after finding, based on genetic test results, that M.B. was not L.J.B.'s biological father.

3

testimony from an expert witness, Bruce Jefferies, regarding the drug testing of L.J.B.'s hair follicles.

Jefferies testified that he has, over the past 20 years, interviewed people who have undergone drug testing at Quest Diagnostics. In these interviews, Jefferies questions the individuals about their drug use. Jefferies testified that by correlating the drug tests with the information gleaned from the interviews he has, over the years, developed the ability to determine from the level of drugs detected in the test whether the person has engaged in "low use or high use or recreational use, exposure, non-exposure." Jefferies testified that he has developed a unique expertise in determining, from the number of picograms of drugs detected in the particular sample, the degree to which the person has used the particular drug detected. Jefferies reviewed the results of the lab testing done on L.J.B.'s hair and requested that a second test be run at Quest Diagnostics because that lab was FDA approved for drug tests on hair follicles and he believed its testing would provide more accurate information regarding the number of picograms of cocaine present in L.J.B.'s hair. Jefferies testified in detail about the process Quest Diagnostics uses for testing hair follicles. The test of L.J.B.'s hair was positive for cocaine and two cocaine metabolites, norcocaine and benzoylecgonine. Jefferies stated that the presence of the metabolites indicated that L.J.B. had ingested cocaine. Jefferies testified that the amount of cocaine detected, more than 20,000 picograms, indicated that, in his opinion, L.J.B. had ingested cocaine "on a daily basis" over the 90 days before the hair follicle was tested. Jefferies opined that L.J.B. might have ingested cocaine either through breastfeeding or by eating cocaine left by someone in an accessible place. Jefferies stated that 20,000 picograms is a "very extreme high level of cocaine" in a child's system and indicates chronic ingestion of cocaine. D.L.E.B.'s attorney cross-examined the witness but did not object to any aspect of Jefferies's

4

testimony. After the hearing, the court granted the motion for a finding of aggravated circumstances and ordered that visits between D.L.E.B. and L.J.B. cease until further court order.

The case was set for a jury trial in March 2019. At the pretrial conference, the parties agreed to pre-admit several exhibits, including Jefferies's curriculum vitae and the reporter's record of his testimony from the hearing on the motion for a finding of aggravated circumstances. After the jury was empaneled, D.L.E.B.'s counsel stated that he had something he "wanted to put on the record." He then stated:

> I distributed to all counsel and I'll give it to the Court a case. It's the leading case. It's sort of the newest version of the Daubert case in Texas from the Texas Supreme Court. It's from 1996. It's still widely cited. And this case concerns the qualifications of an expert.[3] We've got a drug expert coming in from Houston.[4] And I'm not challenging him at this point.

> What I want to do is I want to have a Rule 705B hearing outside the presence of the jury to discuss his qualifications to reach an ultimate issue. And I think I'm entitled to do that. I don't see anything in the pretrial order saying I can't do that. And it makes sense to do that, because otherwise I'd end up asking him a bunch of questions on the witness stand and anyway in front of the jury. And I just as soon follow the rule and do it outside the presence of the jury and run a cleaner trial.

After hearing arguments from counsel, the trial court stated that it would consider the request and that if it did agree to permit a Rule 705(b) examination of Jefferies, it would take place at the lunch break on the first day of trial. On the morning of the first day of trial, the court informed the parties that it was not granting the request to conduct a Rule 705(b) examination. The trial

---

[3] The case referred to is *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995), a case in which the Texas Supreme Court determined the proper standard for admission of scientific expert testimony under Rule 702 of the Texas Rules of Evidence.

[4] The expert referred to is Bruce Jefferies.

court observed that Jefferies had already testified without objection at a previous hearing and that both his curriculum vitae and a transcript of his testimony had been admitted into evidence without objection.

Jefferies was called as a witness at trial and provided substantially the same testimony as he had previously given at the hearing on the motion for a finding of aggravated circumstances. Counsel for D.L.E.B. did not object to the testimony regarding the levels of cocaine found in L.J.B.'s hair follicles or to the testimony that the levels constituted a very high concentration of cocaine. D.L.E.B.'s counsel cross-examined the witness, focusing primarily on how the rate of growth of a person's hair might affect the levels of cocaine that would be detected in a hair follicle drug test. He also questioned Jefferies regarding his methodology and whether it had been peer reviewed. D.L.E.B.'s counsel did not, however, either object to or move to exclude Jefferies's testimony on any ground.

After a two day trial, at which a number of witnesses testified, the jury returned its verdict finding that grounds existed to terminate D.L.E.B.'s parental rights to L.J.B. and that termination was in L.J.B.'s best interest. The jury further found that L.J.B.'s foster parents should be named her managing and possessory conservators. Thereafter, the trial court signed an order terminating D.L.E.B.'s parental rights to L.J.B. and appointing L.J.B.'s foster parents as her joint managing conservators. D.L.E.B. then perfected this appeal. In one issue, D.L.E.B. asserts that the trial court abused its discretion when it denied the request to conduct a Rule 705(b) examination of Jefferies.

**DISCUSSION**

Rule 705(b) provides that, before an expert in a civil trial states an opinion or discloses the underlying facts or data supporting that opinion, an adverse party may be permitted to examine the expert about the underlying facts or data outside the jury's hearing. Tex. R. Evid. 705(b). In support of her argument that the trial court abused its discretion by not permitting her to conduct such an examination, D.L.E.B. relies on the Texas Supreme Court's holding in *E.I. du Pont de Nemours & Co. v. Robinson* that scientific evidence that is "not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'" 923 S.W.2d 549, 557 (Tex. 1995) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). D.L.E.B. correctly asserts that *Robinson* lays out the factors a trial court may consider in making a threshold determination of the admissibility of expert testimony under Rule 702 of the Texas Rules of Evidence. *See id.* at 557. These include the extent to which the theory has or can be tested, the extent to which the technique relies on the subjective interpretation of the expert, whether the theory has been subjected to peer review or publication, and whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community. *Id.* In her brief on appeal, D.L.E.B. argues that Jefferies's testimony at trial revealed that his technique was not peer reviewed and did not meet the standard for admissibility laid out by the supreme court in *Robinson*. D.L.E.B. asserts that the trial court's refusal to permit counsel to conduct a Rule 705(b) examination of the expert prevented her from "bring[ing] the deficiencies [in the expert's testimony] to the court's attention before the jury heard it."

Rule 705 creates a procedural mechanism to voir dire an expert outside the presence of the jury. The purpose of this examination is twofold: (1) it provides the defendant

7

the opportunity to determine the foundation of the expert's opinion without the fear of eliciting inadmissible evidence in the jury's presence, and (2) it may supply the defendant with "sufficient ammunition to make a timely objection to the expert's testimony on the ground that it lacks a sufficient basis for admissibility." *Goss v. State*, 826 S.W.2d 162, 168 (Tex. Crim. App. 1992); *see* Tex. R. Evid. 705(c).

The use of the word "may" in Rule 705(b) makes a voir dire examination of an expert outside the presence of the jury discretionary with the court in civil cases. *See* Tex. R. Evid. 705(b).[5] "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). In the present case, D.L.E.B.'s counsel stated that he desired to conduct a 705(b) examination to "discuss [Jefferies's] qualifications to reach an ultimate issue." That, however, is not the purpose of a Rule 705(b) hearing which, instead, is designed to permit a party "to examine the expert about the underlying facts or data." *See* Tex. R. Evid. 705(b); *In re Estate of Trawick*, 170 S.W.3d 871, 875 (Tex. App.—Texarkana 2005, no pet.) ("The contestant's request to voir dire the witness for the purpose of 'going into' his qualifications did not invoke the rules pertaining to inquiry into 'the underlying facts or data' on which the expert's opinions are based."). Moreover, the trial court's denial of the request for a voir dire examination outside the presence of the jury in no way hindered counsel's ability to challenge Jefferies's qualifications during the trial through cross-examination or otherwise. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998) (emphasizing that trial court's gatekeeping

---

[5] In a criminal case by contrast, the party against whom the opinion is being offered has a right to examine the expert outside the presence of the jury as to the basis of his opinion. *See Goss v. State*, 826 S.W.2d 162, 168 (Tex. Crim. App. 1992) (noting that voir dire under Rule 705(b) is not discretionary in criminal cases).

8

function under Rule 702 has not replaced cross-examination as "the traditional and appropriate means of attacking shaky but admissible evidence"). Nor did it prevent counsel from moving to exclude Jefferies's testimony on the ground that it was "not grounded in the methods and procedures of science." *See Robinson*, 923 S.W.2d at 557. In fact, counsel for D.L.E.B. did cross-examine Jefferies about his methodologies regarding drug concentrations in hair follicles at a pre-trial hearing, yet never objected to the admissibility of the expert's testimony at trial. We conclude that the trial court did not abuse its discretion in denying D.L.E.B.'s request for a voir dire examination of Jefferies outside the jury's presence pursuant to Rule 705(b).

It is unclear whether, in addition to complaining about the court's refusal to permit him to conduct a Rule 705(b) examination, D.L.E.B. is also asserting that the trial court erred in admitting Jefferies's testimony at trial because it failed to meet the standard articulated in *Robinson*. In any event, any such complaint has not been preserved for appellate review. A party has two fundamental options to preserve a complaint concerning an expert's testimony: object to the testimony before trial or object when it is offered. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) (explaining that *Robinson*'s focus is on trial court's discretion in admitting or excluding scientific evidence after party lodges objection to reliability of its opponent's scientific expert testimony before trial or when evidence is offered). Here D.L.E.B. did neither.

Counsel for D.L.E.B. never objected to the admissibility of Jefferies's testimony at the hearing on the motion for a finding of aggravated circumstances or at trial. Counsel also failed to file a motion to exclude Jefferies's testimony on any ground, including that it was speculative and unreliable, and did not request a *Daubert/Robinson*-type hearing. The trial court was never asked to make a ruling on whether Jefferies's expert testimony was admissible under

Rule 702 of the Texas Rules of Evidence. *See* Tex. R. Evid. 702. D.L.E.B.'s request for a Rule 705(b) hearing does not preserve a complaint about the admissibility of Jefferies's testimony. *See* Tex. R. App. P. 33.1(a) ("To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, unless such grounds are apparent from the context."). The purpose of a Rule 705(b) hearing is to permit a party to conduct a voir dire examination of the expert, outside the presence of the jury, "directed to the underlying facts or data upon which the opinion is based." *See* Tex. R. Evid. 705(b). This permits counsel to examine an expert to elicit evidence on which it may base a Rule 702 objection without the risk of the jury hearing what may later be deemed to be inadmissible evidence. *See Alba v. State*, 905 S.W.2d 581, 588 (Tex. Crim. App. 1995) ("This 'gatekeeping' hearing affords a defendant the chance to voir dire the expert witness and determine the foundation of the expert's opinion without fear of eliciting damaging hearsay or other inadmissible evidence in the jury's presence."). The evidence elicited in such an examination may provide the basis for an objection to the admissibility of an expert's testimony or a motion to exclude that testimony, but the request for such an examination does not itself constitute an objection to an expert's testimony. Although counsel for D.L.E.B. requested an opportunity to examine Jefferies's "qualifications," he did not object to the admission of Jefferies's testimony then or at trial. In fact, counsel expressly stated: "And I'm not challenging him at this point." We conclude that D.L.E.B. failed to preserve a complaint that Jefferies's expert testimony was inadmissible.

**CONCLUSION**

D.L.E.B. has not demonstrated that the trial court abused its discretion by denying the request to examine Jefferies about the facts or data underlying his opinions outside the presence of the jury pursuant to Rule 705(b). D.L.E.B. has failed to preserve a complaint that Jefferies's testimony was inadmissible under Rule 702. We therefore overrule D.L.E.B.'s sole appellate issue and affirm the trial court's order terminating D.L.E.B.'s parental rights to L.J.B.

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: August 8, 2019