# NO. 12-19-00077-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE MATTER OF THE ESTATE* | *§* | *APPEAL FROM THE 273RD* |
| *OF CHARLES HERMAN BERRY,* | *§* | *DISTRICT COURT* |
| *DECEASED* | *§* | *SHELBY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Elizabeth Berry Gonzales appeals from the trial court's order probating the will of her late father, Charles Herman Berry. In four issues, she contends that the statutory notice requirements were not followed, and the evidence does not support the court's findings regarding the decedent's capacity and whether the will was revoked. We affirm.

## BACKGROUND

After Charles Herman Berry died, his wife Janice filed an application to probate his will and for letters testamentary in the County Court of Shelby County. She attached an affidavit explaining that Charles executed a will on May 12, 2005, but the original will was lost, and she offered a copy in its place. In the will, Charles bequeathed his entire estate to Janice. Elizabeth Gonzales, one of Charles's daughters from a previous marriage, filed an opposition to the application to probate Charles's will and issuance of letters testamentary. Elizabeth opposes probate of the copy of her father's will because she believes he destroyed the original will, thereby revoking it. The cause was transferred to the 273rd District Court of Shelby County. After a hearing, the trial court determined that the will was not revoked, and the absence of the original will was explained. The court rendered an order probating the will and authorizing letters testamentary. The court filed findings of fact and conclusions of law in which it found the will was executed in compliance with the law, after a diligent search the original could not be found, at the time of the alleged revocation of the will, Charles would have lacked testamentary capacity

to revoke the will, and Charles did not revoke the will. Elizabeth appealed from the order probating the will.

## SERVICE OF CITATION

In her third issue, Elizabeth contends that Janice failed to comply with the statutory notice requirements of the Texas Estates Code. She asserts that the record is devoid of any request for or service of personal citation on her sisters, Cheryl Zimmerman and Carolyn Howard, as required by Estates Code Section 258.002(b). Further, she argues, pursuant to Section 258.003, in the absence of proper service of citation, the trial court was not authorized to act on the application to probate the will.

### Applicable Law

On the filing of an application for the probate of a written will that cannot be produced in court, the clerk must issue a citation to all parties interested in the estate. TEX. EST. CODE ANN. § 258.002(a) (West 2014). If the heirs are residents of Texas and their addresses are known, the citation must be served by personal service. *Id*. § 258.002(b). A court may not act on an application for the probate of a will until service of citation has been made in the manner provided by the estates code. *Id*. § 258.003. The object of a citation is to give the court proper jurisdiction over interested parties and to notify the defendants that the suit is filed in order that the defendants may be heard in a court of competent jurisdiction. *Ellison v. Patton*, 303 S.W.2d 855, 857 (Tex. Civ. App.–Amarillo 1957, writ ref'd); *Heavey v. Castles*, 12 S.W.2d 615, 616 (Tex. Civ. App.–Eastland 1928, writ ref'd).

### Analysis

Janice acknowledges that Carolyn and Cheryl were not served but argues that their appearance in court and presentation of testimony has the same force and effect as if citation had been duly issued and served as provided by law. This argument generally pertains to the question of a trial court's jurisdiction over a party. For a trial court to have jurisdiction over a party, the party must be properly before the court in the pending controversy as authorized by procedural statutes and rules. *In re Suarez*, 261 S.W.3d 880, 882 (Tex. App.–Dallas 2008, orig. proceeding). The record must show proper service of citation, an appearance, or a written memorandum of waiver of service of citation. *Id*. at 882-83. However, Carolyn and Cheryl were not "parties," they were merely witnesses. While service of process is waived when a person makes a general

2

appearance before the court, merely appearing as a witness in a cause does not serve as a general appearance subjecting one to the jurisdiction of the court. *Werner v. Colwell*, 909 S.W.2d 866, 869-70 (Tex. 1995).

Janice's application to probate the will included Cheryl's and Carolyn's names and addresses because they are heirs of the decedent. As they both live in Texas, the applicable statute required that they be personally served with citation. TEX. EST. CODE ANN. § 258.002(b). In light of the fact that these two heirs were not served, we next consider whether Section 258.003's prohibition on court action before service of process affects the trial court's judgment. *See id.* § 258.003. The statute does not provide for any consequences applicable when a court proceeds to hear the cause even though some heirs have not been served.

The court acquired jurisdiction of the estate upon the filing of the application to probate the will. *See Heavey*, 12 S.W.2d at 616. Thus, the court had jurisdiction over the estate, probate proceedings, contest to probate, and Elizabeth. *See Dolenz v. Vail*, 143 S.W.3d 515, 517-18 (Tex. App.−Dallas 2004, pet. denied); *Heavey*, 12 S.W.2d at 616. Further, both the action to probate the will and the action contesting the will are in rem proceedings. TEX. EST. CODE ANN. § 32.001(d); *Miller v. Foster*, 13 S.W. 529, 533 (Tex. 1889). "An in rem judgment . . . is binding upon the whole world and specifically upon persons who have rights or interest in the subject matter, and this is so whether those persons were or were not personally served." *Ladehoff v. Ladehoff*, 436 S.W.2d 334, 336 (Tex. 1968).

Cheryl and Carolyn had actual knowledge of the probate proceedings and Elizabeth's contest, and they chose not to join the contest. Cheryl and Carolyn were not parties in the trial court and are not parties to this appeal. Elizabeth has not explained how the trial court's act of conducting the trial without proof of service of process on Cheryl and Carolyn caused the rendition of an improper judgment or prevented Elizabeth from properly presenting her case to this court. *See* TEX. R. APP. P. 44.1(a). Therefore, although the trial court did not comply with Section 258.003, we conclude that such noncompliance constitutes harmless error on the facts of this case. We overrule Elizabeth's third issue.

## TESTAMENTARY CAPACITY

In her first issue, Elizabeth asserts the evidence is insufficient to overcome the presumption that the decedent revoked the original will. She argues that the decedent was the last to have

possession of the will, and he told Janice that he tore it up. She simultaneously asserts that the great preponderance of the evidence supports a finding of revocation by intentional destruction and that Janice did not prove the cause of nonproduction of the original will or that she exercised reasonable diligence in locating the original will. In her second issue, Elizabeth contends there is insufficient evidence that the decedent lacked testamentary capacity when he tore up his will.

**Standard of Review**

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which she did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 860 (Tex. App.−Tyler 2013, no pet.). In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports it. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.−Houston [14th Dist.] 2013, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id*. If there is any evidence of probative force to support the finding, i.e., more than a scintilla, we will overrule the issue. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (per curiam).

When a party challenges the factual sufficiency of the evidence supporting a finding for which she did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Cain*, 709 S.W.2d at 176. The factfinder is the sole judge of the credibility of the witnesses and the weight to afford their testimony. *City of Keller*, 168 S.W.3d at 819. The factfinder may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *Id*. Because it is the factfinder's province to resolve conflicting evidence, we must assume that the factfinder resolved all conflicts in accordance with its verdict if reasonable human beings could do so. *Id*.

4

**Applicable Law**

A written will may not be revoked, except by a subsequent will, codicil, or declaration in writing that is executed with like formalities, or by the testator destroying or canceling the same, or causing it to be destroyed or canceled in the testator's presence. TEX. EST. CODE ANN. § 253.002. A presumption of revocation arises when the will proponent does not produce the will in court, and it was last seen in the testator's possession, or in a place to which he had free access to it. *McIntosh v. Moore*, 53 S.W. 611, 613-14 (Tex. Civ. App.−San Antonio 1899, no writ). The burden is upon the will proponent "to overthrow this presumption." *Id*. A testator must have testamentary capacity to revoke his will. *Dean v. Garcia*, 795 S.W.2d 763, 764 (Tex. App.−Austin 1989, writ denied) (per curiam). Therefore, a showing that he did not have sufficient capacity rebuts the presumption of revocation. *McIntosh*, 53 S.W. at 614.

Testamentary capacity means sufficient mental ability, at the time of the execution of the will, to understand the business in which the testator is engaged, the effect of his act in making the will, and the general nature and extent of his property. *In re Estate of Trawick*, 170 S.W.3d 871, 876 (Tex. App.−Texarkana 2005, no pet.). Additionally, the testator must know his next of kin and the natural objects of his bounty, and the testator must have a sufficient memory to collect in his mind the elements of the business to be transacted and to hold them long enough to at least perceive their obvious relation to each other and be able to form a reasonable judgment about them. *Id*.

The relevant inquiry is the condition of the testator's mind at the time of the alleged revocation. *See Baptist Found. of Tex. v. Buchanan*, 291 S.W.2d 464, 472 (Tex. Civ. App.−Dallas 1956, writ ref'd n.r.e.). Absent direct evidence indicating the testator lacked capacity on that date, the testator's mental condition on that date may be determined from lay opinion testimony based on witnesses' observations of the testator's conduct prior or subsequent to the revocation. *See Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). Evidence of incompetency at other times is probative of incompetency on the date of the will's revocation if some evidence demonstrates that condition persists and has some probability of being the same condition which existed on the date the will was revoked. *Id*.

**Analysis**

Charles Berry executed a will in 2005, leaving everything he owned to his wife, Janice. The will was kept in a bank safety deposit box until August 2016 when Janice removed it and gave

5

it to Charles. Charles later told Janice that he tore up the will because he was mad at her. Although she did not believe him, she did not search for the will at the time. Charles died January 26, 2017, and she searched for the will the following month.

Janice testified that, in the summer of 2016, Charles accused her of being unfaithful and asked her to stay with their daughter, which she did for two to three weeks, beginning August 5. It was during the time she was staying with their daughter that she gave the will to Charles.

She testified that, in August 2016, Charles was having delusions that she was being unfaithful, someone tapped on the side of their mobile home, people were talking outside in the middle of the night, and people were in their front yard. These delusions began in 2015, but he did not see a medical professional about the delusions. He was also very forgetful. He would forget to turn off the water faucet and once forgot to turn off the car ignition after driving home. Janice also testified that Charles accused her of being unfaithful throughout their forty-year marriage. Additionally, Janice described him as paranoid because he put new locks and chains on the doors of their home. She said he constantly accused her of doing things she did not do and felt he did so because of his paranoia. Janice testified that the delusions and lapses continued until his death. On January 3, 2017, he was involved in a motorcycle accident. During the twenty-three days between the accident and his death, he was rarely awake and, when he was awake, he was confused and did not seem to have a sound mind. Further, Janice testified that, for the last four months of Charles's life, he would not speak to his brother Gene, who lived next door. She testified that Charles told Gene about his delusions, and Gene tried to explain that there were no people in the yard.

Janice testified that she did not know whether she would have trusted Charles to know what business he was engaged in but she believed he knew the effects of his acts in and after August 2016. She testified that he was mentally capable of making another will and had sufficient memory to collect his thoughts. She said that if he were himself, he would not have made the mistake that caused the accident.

Gene Berry testified that, approximately six months before he died, Charles stopped talking to him as much as he used to visit with and talk to him. Gene did not know what was wrong. Charles started carrying a gun when he was outside "just in case." Gene explained that Charles put chains on the back door of the house and locks on the front and back doors as well as his bedroom door because he was worried about someone breaking in. This concern began shortly

before Charles and Janice separated. Gene guessed Charles's behavior could be characterized as delusional. He acknowledged the possibility that someone actually tapped on the side of the house at night and there might actually have been people outside talking that caused Charles to be concerned about burglars. He could not say whether Charles was capable of conducting business, but Charles was not acting like he usually acted. He told his wife there is something wrong with Charles, he was "not like he used to be." He also testified that Charles "wasn't himself." When asked if Charles told Janice to move out because of "these voices he was hearing and things he had seen," Gene responded, "I guess, yeah."

Gene did not know what Charles thought regarding his understanding of what he owned or did not own. Gene believed that Charles knew who his heirs were. He acknowledged that Charles told him he heard someone knocking on the side of his trailer and heard people talking. He denied that Charles was insane the last six months of his life and stated that Charles could take care of himself and ride a motorcycle.

Cheryl Zimmerman, one of Charles's daughters, testified that she lives in Houston but remained in contact with Charles. She last visited him in 2014 or 2015. She spoke with him by phone four or five times in 2016. She was not aware that he supposedly suffered from delusions and detected no reason to be concerned about his mental well-being. She stayed with him at the hospital for several days after his accident. Initially, he was able to talk, and he seemed normal. She saw no indications of delusions, paranoia, or mental decline. He recognized her and her sisters. About two weeks after the accident, he was transferred to a hospital in Houston and was not as communicative. While at the hospital, Gene told her he and Charles had a disagreement, and they had not talked in a long time. Charles never told her about seeing people outside his house, hearing noises, or being paranoid.

Carolyn Howard testified that she saw Charles, her father, in the hospital after his accident. He was coherent and everything seemed normal. She noticed no major changes to his mental state. Carolyn testified that Gene told her that he and Charles had a falling out and had not spoken in a long time. Carolyn did not see her dad in 2016, and he never shared with her that he was having delusions, was paranoid, or took extra security measures.

Elizabeth Gonzales testified that she had occasional contact with her dad over the years. Before his accident, she had no reason to be concerned about his mental state. She saw him in the hospital after his accident. He was talking, seemed normal, and did not seem like he had any

7

mental deficiencies. At the hospital, she learned that Gene and Charles had some sort of falling out and had not been talking for a long time. She was unaware of the allegations regarding his mental state until litigation began. She testified that she believes Charles destroyed the will on purpose and that he had sound mind when he did it. She does not believe her father was delusional.

Charlene Berry, Gene's wife, testified that she lives right behind Charles and Janice's house, and they visited frequently. She has a close personal relationship with Janice, and she was around Charles. She explained that, toward the end of his life, Charles was "totally different." He commented on vehicles stopping at the stop sign by his house and idling a long time, which no one else heard. He told her someone was knocking on the trailer in the middle of the night. He would get his gun and go outside in the night to investigate. He said he could smell cigarette smoke coming through the air conditioner in their bedroom. She described him as "very, very paranoid." She said he would see people and was not himself. She explained that Charles was hard of hearing, and she questioned whether he could have heard something tapping on the trailer. Charlene explained that Charles used to visit with them outside, but in the last few months before he died, he became reclusive, staying in the house and locking it so no one could get in. He also put a large stick under the doorknob of the bedroom door. She explained that "he was hearing people, you know, talking and it's like he would – he was thinking in his mind that people were – are trying to break into their house, you know, so that's why he would – he would lock them in." He carried a gun everywhere.

Charlene testified that Charles said he and Janice needed a break from each other and asked her to leave. She admitted to knowing that Charles asked Janice to leave because he thought she was being unfaithful to him, but she said that was silly. She said Janice could not have snuck out of the trailer because Charles had her locked in. While Janice was staying with their daughter, Charles would not speak to Gene and Charlene at all. Charlene testified that, after Janice returned, Charles told them that he tore up the will but that it was not a big deal because his lawyer had the will. She stated that he was not himself, not acting right, during the time period in which he tore up the will. Charlene explained that when he told Janice to leave, he also wanted everything of hers out of the house. Janice took her loveseat to her daughter's house and then Charles started tearing the carpet up. Charles "started doing stuff there at the house that was really, you know, different." She also stated that sometimes he rambled. Charlene testified that she had no reason

to think that Charles did not know what property he owned in the last six months of his life. She thought he could identify the property he owned and his heirs.

Amanda Berry, Janice and Charlie's daughter, testified that Charles had been delusional for quite some time. She explained that he locked them in their fifty-year old trailer house that no one would want to break into. She described a time when her brother went to see their parents late one night, and Charles answered the door with a gun. She stated that he carried his gun from the house to the shed. He kept a gun on him at all times since 2013. Amanda explained that Charles thought someone was outside knocking on the house, and he heard trucks and people that were not there. She stated that she did not know if Charles tore up the will, and it would not be the first time he told a lie. Amanda believed Charles felt like something was wrong. She said no one found pieces of the will or any indication that he actually tore it up. She said that if he put it in the shed they would probably never find it. Amanda testified that she believes Charles could identify the property he owned and his children, and he knew who he was married to.

Charles's son, Robert, testified about a time he went to his dad's house after dark and Charles came out into the yard trying to start a fight, not realizing it was his son. A neighbor had to separate them, and when the incident was over, Charles recognized him. Robert explained that, toward the end of Charles's life it got a little worse. Charles would say one thing and then, ten or fifteen minutes later, he would say the same thing as if he did not remember saying it already. Robert explained that while on the phone with his dad, Charles would ask him a question, and then ask the same question two or three minutes later. Charles repeated himself a lot more the older he became. Robert testified that, toward the end of his life, Charles probably did not know what he owned. Robert said he would not feel comfortable asking him to go to the store to buy something. Charles would walk to his shed to do something but forget what he was going to do and sit there with a blank stare on his face. And he would walk outside and forget why he went outside.

The family members who lived with and near Charles, who saw him frequently, testified that for several months prior to his death he was delusional, paranoid, and had memory problems. There was testimony that he did not act like himself, became reclusive, had an altered relationship with his brother, and asked his wife of forty years to leave their home. At least on one occasion, he failed to recognize his son. One close family member, Robert, did not believe Charles knew what he owned.

There is evidence that Charles did not have sufficient memory to collect in his mind the elements of business to be transacted and hold them long enough to perceive their relation to each other and form a reasonable judgment about them. *See In re Estate of Trawick*, 170 S.W.3d at 876. A reasonable factfinder could disregard Janice's testimony to the contrary and Elizabeth's conclusory statements that Charles was not delusional and was of sound mind. *See City of Keller*, 168 S.W.3d at 827. Thus, the trial court could determine that Charles was incapable of exercising judgment, reason, and deliberation, or of weighing the consequences of his will. *Bradshaw v. Brown*, 218 S.W. 1071, 1072 (Tex. Civ. App.–Dallas 1920, writ dism'd w.o.j.). Further, the trial court could have determined that Charles lacked the ability to understand his business or the effect of tearing up the will. *See In re Estate of Trawick*, 170 S.W.3d at 876.

A testator is expected to know his next of kin and natural objects of his bounty. *See id*. Here, the record includes evidence that Charles knew his heirs. Additionally, two witnesses also testified that he could identify his property. The ability to identify property and heirs is just a part of the competency requirements. Yet the significance of knowing the property and people involved fades if the testator is unable to understand his business or form reasonable judgments. To the extent this testimony is contrary to the court's findings, the trial court was entitled to disregard this evidence in light of the substantial evidence of Charles's declining mental state. *See City of Keller*, 168 S.W.3d at 827. Thus, there is more than a scintilla of evidence to support the finding that Charles did not have testamentary capacity at the time he allegedly tore up the will. *See Hernandez*, 164 S.W.3d at 388.

In reviewing the factual sufficiency of the evidence, examining the entire record, we note there is some evidence contrary to a determination that Charles lacked the ability to form reasonable judgments about his personal business. Janice said he knew the effect of his acts, had sufficient memory to collect his thoughts, and was mentally capable of making a will. The trial court was entitled to give little weight to this testimony. *See City of Keller*, 168 S.W.3d at 819. Elizabeth, Cheryl, and Carolyn testified that they had seen no indication that Charles was delusional. The trial court could reasonably infer that they had seen no such indication because they had not visited with Charles in 2016. They only saw him in the hospital after his accident and had only occasional phone contact with him in 2016. It was within the province of the trial court to resolve conflicting evidence. *See id*.

We conclude the trial court's finding that Charles lacked the testamentary capacity to revoke his will is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Thus, the evidence is factually sufficient to support the trial court's finding. *Id*; *In re Estate of Trawick*, 170 S.W.3d at 876. This showing rebuts the presumption of revocation. *See McIntosh*, 53 S.W. at 615.

Elizabeth, in her first issue, also asserts that Janice did not prove the cause of nonproduction or that she exercised reasonable diligence in locating the original will. In a suit to probate a will that cannot be produced in court, in addition to the regular statutory requirements for proving an attested will, the proponent must prove the cause of the nonproduction of the will. TEX. EST. CODE ANN. § 256.156(b)(1). The evidence must satisfy the court that the will cannot by any reasonable diligence be produced.[1] *Id*.

Janice testified that she looked for the will but was unable to find it. Amanda acknowledged that no one found pieces of the will. She also said the will would probably not be found if Charles put it in the shed. This is legally and factually sufficient to support the trial court's finding that Janice exercised reasonable diligence in locating the original will to prove the cause of nonproduction. *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176.

We overrule Elizabeth's first and second issues. We need not reach Elizabeth's fourth issue in which her attacks on the trial court's findings of fact are largely repetitive of her arguments in issues one through three. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

The evidence is legally and factually sufficient to support the trial court's findings that the will could not be found and Janice exercised reasonable diligence in searching for the will, and that Charles lacked testamentary capacity to revoke the will, and therefore, the will was not revoked. Accordingly, we *affirm* the trial court's order probating the will and authorizing letters testamentary.

**GREG NEELEY**
Justice

---

[1] The statute also requires the proponent to prove the contents of the will. *Id*. § 256.156(b)(2). A copy of the original will was introduced into evidence supported by an affidavit of the attorney who drafted it and witnessed its execution. Elizabeth does not complain of this element.

Opinion delivered December 31, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 31, 2019**

**NO. 12-19-00077-CV**

**IN THE MATTER OF THE ESTATE OF
CHARLES HERMAN BERRY, DECEASED**

Appeal from the 273rd District Court

of Shelby County, Texas (Tr.Ct.No. 18CV34342)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the order of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellant, **ELIZABETH BERRY GONZALES**, for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*